## GREGORIO CORTEZ v. THE STATE.

### No. 2397. Decided January 15, 1902.

**1.—Motion to Change Venue—Bill of Exceptions—Practice on Appeal.**

The motion of defendant for change of venue will not be considered on appeal where a bill of exceptions to the overruling of the same was not reserved and filed, during the term of the court, which embraced a statement of the facts adduced on the motion.

**2.—Murder—Continuance—Circumstantial Evidence.**

On a trial for murder, where no conspiracy between the defendant and other parties to commit the crime was shown, and where the testimony as to the identity of the slayer was wholly circumstantial, a continuance should have been granted for a witness who was with deceased at the time, and who would have testified to facts rendering it impossible that defendant could have fired the fatal shot.

**3.—Same.**

On a trial for the murder of a sheriff while making an arrest, the testimony of an absent witness, who was with the sheriff at the time, to the effect that said sheriff did not announce his official capacity and his purpose in making the arrest, is material, and the continuance should have been granted.

**4.—Same—Bill of Exceptions—Reflection Upon the Court.**

Where a bill of exceptions alleged a secret conference between the district attorney and the court pending the motion for continuance, this was a reflection upon the court, and the bill should not have been allowed.

**5.—Murder—Evidence—Confession in Foreign Language.**

On a trial for murder, where a witness, who testified to defendant's confession, which was in Spanish, stated that he was not thoroughly acquainted with that language; that he could not repeat the language used by defendant, but could merely translate into English what the defendant had said in Spanish. Held, the confession should be rejected, as it did not appear that the witness thoroughly understood the language in which the prisoner spoke so as to be able to state accurately the substance of what was said in the conversation.

**6.—Same—Evidence—Statement by Defendant.**

On a trial for murder, testimony as to the statement of a criminative fact by defendant after his arrest is admissible under a proper warning.

**7.—Confession, Whether Voluntary or Not, a Question for the Jury, When.**

Where the accused was in jail for the murder of a sheriff, and three armed sheriff's from other counties appeared at the jail and caused the jailer to bring defendant from his cell into their presence, and after giving him some beer and a bottle of whisky, and after warning him through the jailer, who acted as interpreter, asked him concerning the killing; Held, that inasmuch as defendant was not told that he could not be compelled to make any statement, the court should have submitted the question to the jury as to whether or not his confession, under the circumstances detailed, was freely and voluntarily made.

**8.—Murder—Evidence as Res Gestae and to Show Motive.**

On a trial for the murder of a member of a sheriff's posse, which, according to the State's theory, was endeavoring to arrest defendant for the murder of the sheriff of an adjoining county, testimony to the effect that defendant had killed said last named sheriff was admissible, as it tended to show that defendant was a fugitive from justice and was determined to resist an arrest; and furthermore, it was admissible as tending to explain the conduct and motives of the officers and posse that were seeking to arrest defendant. It also tended to indicate the intent of defendant in what he did.

**9.—Same—Evidence.**

On a trial for the murder of one of a sheriff's posse which was seeking to arrest defendant, the consultation had between the members of the posse before

they approached the house, as to how they should approach the house in which defendant was, and what should be done on arriving at said house, was not competent as evidence.

**10.—Same.**

A discussion among the members of the sheriff's posse shortly after the killing, in which the opinion was expressed that deceased was killed accidentally by a member of their posse, was incompetent and properly excluded by the court, it not being admissible as original evidence.

**11.—Same.**

Nor was it competent, as original evidence, to prove that some time after the homicide, while certain ones of the posse were together discussing the killing, some one stated that the black bottle they had bought was what did the work and caused the killing. If the party who made the remark had been a witness he might, on cross-examination, have testified that the sheriff and his posse were intoxicated at the time of the homicide.

**12.—Evidence as to Defendant's Ability to Speak English.**

It was competent to permit a sheriff to testify that he had talked with defendant in jail, and that defendant could speak English. The fact that he had learned this through his intercourse with defendant while in jail would not exclude the testimony.

**13.—Murder—Charge as to Principals.**

On a trial for murder, a charge as to principals would not be authorized if no conspiracy was shown, and defendant did no act at the time in aid or encouragement of the party doing the killing.

**14.—Murder—Arrest Without Warrant—Charge.**

On a trial for murder, where it unquestionably appeared that the object of the sheriff and his posse in going to the place where the killing occurred, without a warrant, was to arrest defendant for the murder of the sheriff of an adjoining county, the court in its charge should have instructed the jury as to the law authorizing an arrest without warrant, and the rights of the sheriff and his posse in executing the arrest should also have been stated to the jury.

**15.—Same—Resistance to Illegal Arrest.**

Where a sheriff and posse are attempting an arrest without warrant, and the party does not give the sheriff time to declare his purpose, but fired upon him and his posse, he could not claim self-defense or be justified on the ground of resisting an illegal arrest without warrant. If, on the other hand, the sheriff and his posse, having no time to procure a warrant and without any notification to defendant of their purpose to arrest, began firing upon him, defendant would have the right to resist such attempt at arrest.

Appeal from the District Court of Gonzales. Tried below before Hon. M. Kennon.

Appeal from a conviction of murder in the second degree; penalty, fifteen years imprisonment in the penitentiary.

Appellant was charged by the indictment with the murder of Henry Schnabel, on the 14th day of June, 1901, by shooting him with a gun.

The opinion states the material facts shown in evidence on the trial.

*R. B. Abernathy,* for appellant, filed an able and elaborate brief.

*Rob't A. John,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of fifteen years.

It appears from the statement of facts that appellant, a few days before the alleged killing, in Gonzales County, had killed the sheriff of Karnes County, and had fled. Sheriff Glover, of Gonzales County, with a posse, was searching for appellant in the latter county. On their way to the place of one Henry Schnabel they met him, and he returned with them to the house of Martin Roblero, a Mexican, arriving about 8 o'clock at night. They approached the house from the north and rear. Sheriff Glover and Crispino Alcantar, a deputy sheriff, went around the house on the east side, and the other members of the posse, Swift, Howard, Schnabel, Karnstadt, and Harper, went around on the west side of the house. Almost immediately after they approached the house the firing commenced. The sheriff and his deputies fired a number of shots, and some of the Mexicans at the house returned the fire. Several of the State's witnesses say that when the sheriff approached the house he accosted Martin Roblero, who was at the northeast corner. Davis testified that he said: "Hello, Martin. This is the sheriff of Gonzales County. Where is Bonifacio?" (Bonifacio being the son of Martin Roblero and accused of theft.) Karnstadt testified that he said: "Hello, Martin; I am the sheriff of Gonzales County." Martin Roblero testified that he merely said: "Howdy, Martin," and immediately rode on around the house. The testimony indicates, that as Glover passed the southeast corner of the house a man on the steps at the front of the house began firing, and that he and the sheriff continued firing at each other until the sheriff fell from his horse mortally wounded. The testimony also indicates that, about the same time the firing began on the south and west of the house, some firing came from the house; that Schnabel, deceased, was killed during this firing, near the barn, which was west from the house about twenty yards. The plat on following page shows the situation of the house and the immediate environments, indicating where the sheriff was killed, and also where Schnabel, deceased, was killed.

The testimony indicates that when the posse approached the house, Martin Roblero and appellant were at or near the northeast corner of the house, appellant having arrived at the house only a short time previously, and it is suggested that he must have gone from that point around the east side of the house toward the south; but whether it was he who had the duel with the sheriff, and finally shot him, is not made clear. From the record it appears there were two other men (Mexicans) at the house besides appellant, to wit, Bonifacio (the son of Roblero), and a low, heavy-set, dark Mexican. What part they took in the fight is not made manifest. As to who killed Schnabel is one of the important questions in the case. But, according to the uncontradicted testimony, whoever killed him must have been very close, as his head near the wound was powder burned, and the party who inflicted the wound must have stood within five or six feet of him.

S. T. Davis, a deputy sheriff, testified that the last time he saw Schnabel he was on horseback, about fifteen steps from the house. Harper and Swift were there. Swift was at the back door; there had already

been firing from the front of the house; that as he passed the house he
saw a man run in the direction of the creek; that he told him to hold up;
that the man never spoke, but fired at him, and they ran around a tree
several times, firing at each other; that the man evidently had on shoes,
as he saw shoe tracks around the tree the next morning. He does not
suggest that this was defendant.

Swift says that he got off his horse, and ran in the back door; that the
last he saw of Glover he was on the east side of the house, on horseback,

and Alcantar, who had gotten off his horse, was behind him on foot.
The first shots he heard were fired as he stepped in the back door.
Martin Roblero went in the house in front of him, and when he got
in the back door the shooting began at the front steps. While he was
standing in the back door two men were running back and forward, and
he did not like their maneuvers, and a man came running in the room
where he was and he shot at him and he fell. Another man ran in, and a
woman came in between said party and witness, and he could not shoot
again. He arrested these two men, and they are now in jail. He found
in the house one single-barrel shotgun, one Winchester, and three pistols.
The guns were loaded; the pistols were not. None of them had been
used that night.

Harper, another witness for the State, testified as did the others with reference to approaching the house and the direction the parties took. He further stated that when he got to the southwest corner of the pen he got off his horse, and walked up about halfway of the south line of the fence of the pen, between it and the barn where Schnabel was killed. The first firing he heard sounded near the southeast corner of the house. There was a light in the house, and firing in the house, and witness fired in at the window. He saw Schnabel off his horse twice, from the light of the window. He passed in and out of the light, near the southwest corner of the house. Directly he saw Schnabel at the barn, heard a shot right at him, heard him groan, and saw him fall. He was within ten or twelve steps from witness. On cross-examination, witness admitted that he may have said that night he saw the Mexican woman shoot Schnabel from the window, and that he (witness) shot her; that was his theory that night; that he did not think he could have shot Schnabel, as he shot into the window; that he had a Winchester, and shot twice at the window; that he did not think it possible that he might have shot Schnabel, as he shot in the window.

Howard testified substantially that the posse rushed up to the house in a run; that Glover accosted Martin Roblero, saying, "Hello, Martin; where is Bonifacio?" That Martin made some answer in Spanish; Glover did not speak, but rushed on around toward the southeast corner of the house, about ten or twelve steps from the house; that he stopped on the north side of the house; that the first shooting came from the front of the house, and heavy firing from near the southeast corner; that he could not see the shots from where he was, but could tell from the flashes; that he saw Schnabel after he got around on the west side of the house; first saw him on horseback by the light from the window in the house; then saw him two or three times near the south window, on the west side. This witness also testified on cross-examination that shortly after the shooting he heard Harper, one of the posse, say that a woman who was wounded shot Schnabel from the window of the house; that he saw her when she shot Schnabel, and that he (Harper) shot the woman; that Harper told him he thought the body southwest of the house, near the barn, was Schnabel. He did not say that he knew it was Schnabel.

This is about all the testimony that bears on the identity of the party who may have shot Henry Schnabel, except the confession of appellant, which is, in effect, that defendant said he got to Martin Roblero's house between sundown and dark; that he went into the house, and asked for some water, and they gave him a cup of coffee; that after drinking the coffee he pulled off his shoes, as his feet hurt; he asked for Martin, and they told him he had gone hunting; that he walked to the back door and saw Martin coming; that he told Martin he wanted to speak to him, and that Martin took him around on the east side of the house, between the corner and the chimney; that it was dark; that he and Martin talked a short while, when the posse came up in a gallop, and

shot off their pistols; that defendant then ran, shooting as he ran, at the head man, and ran by the barn, shooting back; that he did not know whether or not he had shot anybody; that he stayed all night in a field, and went back the next morning and got his shoes. Defendant said he fired two or three shots in retreating. On cross-examination the witness said that instead of "posse" as stated by him in direct examination, defendant had used words mearning assaulting party, and not posse.

It may be stated here that the testimony showed that the posse were really in pursuit of appellant to arrest him for the killing of Sheriff Morris in Karnes County. They had no warrant, and there is testimony tending to show they had no opportunity to get a warrant. However, appellant controverts this. It may also be remarked that there is no testimony tending to show any preconcert or conspiracy on the part of the other Mexicans who were at the house to aid appellant in resisting an arrest. The testimony shows that he had only arrived at the house a very short time before the posse came up; and there is no evidence that appellant saw or had opportunity to see either Bonifacio or the heavy-set swarthy Mexican, who was seen by one of the witnesses.

This is a sufficient presentation of the case, in order to discuss the questions raised by appellant's assignments of error.

Appellant assigns as error the action of the court in overruling his motion for change of venue. That matter, however, can not be considered, inasmuch as the bill of exceptions filed in term time does not embrace the statement of facts—the statement of facts being filed in connection with the statement of facts in the case, after the expiration of the term, under an order allowing ten days in which to file such statement. Wright v. State, 40 Texas Crim. Rep., 447; White's Ann. Code Crim. Proc., sec. 681.

Appellant's motion for continuance should have been granted. The application was based on the absence of Chrispin Alcantar, who had been summoned by the State (defendant relying on the State's diligence) and at the time of the trial was confined to his bed with sickness and not able to attend. This witness was one of Sheriff Glover's posse, and was the only one who accompanied the sheriff around the east end of the house; that is, he followed the sheriff around that way, the sheriff being on horseback and he on foot. This is a case, so far as the identity of the party who shot Henry Schnabel is concerned, depending on circumstantial evidence; and if appellant did not shoot and kill Schnabel, his responsibility for the latter's death would turn on whether or not there was a prior conspiracy between him and the person who may have killed deceased, or co-operation and concert of action at the time between him and the party doing the killing. The testimony for the State does not tend to show any conspiracy between appellant and some other person who may have killed deceased; and it further shows that appellant at the time of the approach of the posse was at the northeast corner of the house, talking with Martin Roblero. Now, if he ran off in a southerly

direction from the house, and was the party who killed Glover, he could hardly have been the same person who shot Schnabel. The testimony further becomes material, in view of the fact that some of the witnesses testified that, when Glover came to where Martin Roblero was, he announced he was the sheriff, and inquired for Bonifacio; and the application shows it was expected to be proved by said witness that Glover did not announce on his approach to the house that he was the sheriff and had come with a posse for the purpose of making an arrest. His affidavit taken at the inquest is referred to and made a part of the motion, and this shows that his testimony (the case being one of circumstantial evidence) was calculated to operate in favor of defendant in other respects than those mentioned above. The court committed an error in overruling appellant's motion.

By appellant's third bill of exceptions, he seeks to involve the court in an alleged secret conference with the district attorney, pending the motion for continuance. As explained by the court, this bill should not have been allowed, as it was a reflection on the court. Under the qualification there was nothing improper in the action of the judge in communicating, as he did, with the district attorney in regard to the motion for continuance. Indeed, his action was intended to and did shield appellant from any injurious result connected with the matter; and it occurs to us that, on the explanation by the judge, counsel for appellant should have promptly withdrawn the bill and not have insisted, as he does here, that it was a secret conference between the judge and the district attorney.

The State offered the confessions of appellant through the witness Rogers, who stated that he was not thoroughly acquainted with the Spanish language and could not repeat the language used by defendant, but could understand what defendant said and correctly interpret it into English. Appellant objected to this testimony on various grounds; among others that not thoroughly understanding the Spanish language ·(the language in which defendant made his statement) he was not qualified as a witness to testify as to said confession. In this contention appellant was correct. Underhill on Evidence, section 147, states the rule as follows: "A witness called to prove an oral confession need not repeat the exact words of the accused, but it is absolutely essential that he should remember the substance of what was said in the conversation and be able to state it accurately; and unless it should affirmatively appear that the witness thoroughly understood the language in which the prisoner spoke the confession should be rejected." And to the same effect see State v. Buster (Nev.), 47 Pac. Rep., 194; People v. Gebhart, 39 Cal., 663. Now, this witness not only states that he could not repeat the language used by defendant, could not undertake to give his words, but could merely give a translation in English of what appellant had said in Spanish. Appellant further contends that the testimony is not a confession, but the statement of an exculpatory fact; that is, appellant stated he had never been in Gonzales County, where the killing

occurred; and that this could not be used in evidence against appellant, unless he had become a witness and a predicate had been laid for his contradiction, which was not the case here. While this was not a confession strictly speaking, it was a criminative fact; that is, in connection with other evidence which showed that appellant was at the place of the killing, it was used by the State as an inculpatory fact. The authorities referred to by appellant would appear to support him. Ferguson v. State, 31 Texas Crim. Rep., 93; Quintana v. State, 29 Texas Crim. App., 401. However, the later authorities appear to authorize the introduction of such testimony under a proper warning. Mixon v. State, 36 Texas Crim. Rep., 66; Bailey v. State, 40 Texas Crim. Rep., 150; Hernan v. State, 42 Texas Crim. Rep., 464, 1 Texas Ct. Rep., 617.

In connection with this bill of exceptions, we will also notice appellant's fourth bill, which relates to the testimony of the witness Tom, as to the confessions of appellant made in his presence. It appears that after the witness Crowther had testified as to confessions made before him, that he remarked to appellant, "That will do, I am through," and he turned to attend to other business; that at this juncture, Captain Sheeley came in and remarked, "I would like to ask defendant some questions." That Sheeley and defendant then entered into a conversation, which witness Crowther did not hear. Witness Tom then stated that he came into the room about this time, and heard the remark made by Captain Sheeley; that he brought a flask of whisky and gave defendant, and that he heard the conversation between Sheeley and defendant; that it was in the Spanish language, and Sheeley interpreted it into English; that he (witness) could not speak or understand the Spanish language thoroughly, but he could understand what defendant said; that what he would testify as to the confessions of defendant would be from the interpretation given by Captain Sheeley. However, the court on this point informed witness that he could not testify what defendant said through an interpreter, but could only testify what he understood defendant to say, without the aid of an interpreter. Witness then proceeded to state that defendant said in retreating he went by the barn. On cross-examination, however, this witness stated that the word used by defendant, which he interpreted as barn, was "casa," which means a "house," and witness did not know what word in the Spanish language means barn. The introduction of this testimony, as shown in the bill of exceptions, illustrates the danger of this character of testimony, and the wisdom of the rule that requires the witness who interprets to thoroughly understand the language in which the confession was made. The retreat by appellant becomes a very material matter in this case. If appellant retreated by the house, and went south, this would tend to show he was the party who killed Glover and not Schnabel; whereas, if he retreated by the barn, he may have been the party who killed Schnabel. This testimony should not have been admitted. See authorities cited supra.

Bart Crowther was introduced by the State to prove the confession of

appellant made at the jail in San Antonio. It is shown that shortly after appellant's arrest and incarceration in said jail, some time in June, 1901, Sheriff Vann of Kerr County, Joe Sheeley, sheriff of Starr County, F. M. Fly, sheriff of Gonzales County, and one or two others came to witness, who was the jailer, and asked that defendant be brought out of his cell into their presence, that they desired him to act as interpreter, and ask defendant if he desired to make any statement in regard to the killing of Glover, sheriff of Gonzales County, Morris, sheriff of Karnes County, and Henry Schnabel. Defendant was brought into the presence of said parties, and witness, at their request, informed defendant that the parties present desired him to make a statement, and informed defendant that any statement made by him would be used against him on the final trial of the cause growing out of said killing; that defendant did not suggest or request that he be permitted to make such statement; that he gave defendant a glass of beer, and some one gave him a small flask of whisky, but defendant was not under the influence of liquor. Witness thereupon narrated the confession of defendant, set out in the statement of facts; that said officers were armed, and were active in the pursuit and capture of defendant. Defendant objected to the introduction of said confession, for the reasons that defendant was being plied with liquor to induce such confession; that the officers present were there for the purpose of inducing and forcing defendant; that the facts and circumstances surrounding the confession show that the same was not voluntarily made, but that defendant was induced to make the same, and that he was then in both physical and mental duress compelled to make the same. The court allowed the bill, with the statement that there was no evidence tending to show that defendant was in the least under the influence of liquor, as a small flask of whisky was given him upon his own request, and he had taken one drink only when he made the statement. As shown by the bill, we are of opinion that said confession was admissible. But, as was said in Thomas v. State, 35 Texas Criminal Reports, 179: "The circumstances under which the confession is made are of very great importance. They must be looked to in all cases, and when this is done, and there is nothing pointing to the motive prompting the confession, it will be received." This was a case involving a confession in connection with an alleged inducement or promise made to defendant, but the principle in both cases is the same. While here no inducement was held out to appellant, the fact that a number of sheriffs assembled at the jail, who were armed, that they had recently been vigorously pursuing the prisoner, and on their own motion had him brought out, and after warning him, witness informed him that the gentlemen present desired him to make the statement above mentioned, and in this connection was given intoxicating liquors to drink, might suggest that appellant's statement, under such circumstances, was not entirely free and voluntary; more especially as he was not told that he could not be compelled to make any statement. It occurs to us, under the state of facts as detailed in this bill, the court

should have submitted the question to the jury as to whether or not this confession was freely and voluntarily made, after appellant had been duly warned.

The State was permitted, over appellant's objection, to prove by the witness Choate that on the 14th day of June, 1901, he went with Morris, sheriff of ·Karnes County, to where defendant and his brother were in Karnes County, to arrest defendant on a charge of horse theft; that an altercation ·occurred, and defendant shot and killed Morris, after Morris had shot and badly wounded defendant's. brother. To all of which, and to the introduction of any testimony of the killing of Morris, defendant objected, for the reason that the same was irrelevant and immaterial to any issue, and because improper testimony. The court explains the bill, as follows: "That the State merely showed the killing of Sheriff Morris, by this witness, and it was admitted for what it was worth for the jury to determine the motive of defendant in shooting Schnabel (if he did shoot him). Furthermore, this same fact was proved, without objection, by the witness Martin Roblero, who testified that defendant told him that he had killed Morris. Under the doctrine laid down in Jacobs v. State, 28 Texas Criminal Appeals, 79, said testimony was admissible. That was a case in some respects similar to the one at bar; and it was there said "that the former killing established a circumstance which tended to show defendant's motive in committing the homicide. It tended to show that he was a fugitive from justice; he had resolved to fight and resist arrest for a capital crime at any and all hazards, regardless of consequences, and regardless of whether his arrest should be attempted legally or illegally. It furthermore tended to explain the conduct and motives of the officers and posse that were seeking to arrest defendant, and to throw light upon the whole transaction. It was in fact a part of the res gestae of the homicide." Of course, the fact that appellant may have killed the sheriff of Karnes County, and fled from arrest, did not authorize an illegal arrest. But, conceded that the arrest was illegal, the testimony would tend to indicate the purpose and intent of appellant in what he did. Nevertheless, in such case, it was the duty of the court to carefully guard appellant's rights as against an attempted illegal arrest. His action in resisting an illegal arrest might show such a wanton killing as to indicate murder, or it may be no more than manslaughter, or it might be self-defense.

The State was permitted to prove by Swift and Davis that before the posse reached the house where the killing of Glover and Schnabel occurred they had a consultation, and agreed with each other as to the manner of their approach to the house, and what should be done on arriving at said house. The facts as to what said parties said and what they did in pursuance thereof are not stated in the bill, and we can not revise the action of the court in this regard. However, we would state that this character of testimony was not competent.

Appellant offered to prove by certain witnesses that shortly after the killing a number of the members of the posse discussed the killing of

Schnabel among themselves, and expressed to each other the opinion that he had been accidentally killed by Harper, a member of the posse. This was excluded by the court, and appellant insists this was error. As presented, we do not agree with this contention. Of course, if any member of the posse who made such statement or declaration had been introduced as a witness by the State, appellant on cross-examination could have probed such witness as to this matter, and have asked him if he had not stated on a certain occasion that Schnabel was killed by Harper. But the bill does not present the matter in this shape.

The same observations made with reference to this bill are applicable to appellant's tenth bill, in which he proposed to prove that some time after the homicide, and while certain of the posse were together conversing as to the killing, some one (who was not identified) stated that the black bottle they bought at Ottine was what did the work and caused the killing. It was competent on cross-examination to prove by the witness who may have made that remark that he made it, and it was competent, as was attempted, to show that the sheriff and his posse were intoxicated at the time of the homicide.

We do not think there was any error in permitting Sheriff Fly to testify that he had talked with defendant in jail, and that he could speak English. This was no act or declaration of defendant with reference to the offense. The sheriff could testify as a fact that appellant could understand and speak English, and if it appeared on probing his means of information, that this fact had been learned through his intercourse with appellant while in jail, it would not exclude the testimony.

We think it was permissible for the State to show that Bonifacio had not been arrested. At any rate, we fail to see how it could injure appellant.

Appellant complains of the action of the court charging on the doctrine of principals, insisting that there is no evidence in the record showing that if some one else besides appellant killed deceased, Schnabel, there is no testimony showing that appellant acted with such other party as a principal in that homicide. We have examined the record carefully, and there is no positive testimony showing that appellant had entered into any conspiracy prior to the homicide with any other person then present; yet, without any preconcert, appellant may have participated with some other person in the killing of Schnabel, and this might be shown by the circumstances occurring at the time of the killing as to what appellant did in that connection. However, the charge on this subject should have been carefully guarded; and, if appellant did no act in aid or encouragement of the party killing Schnabel at the time, he would not be responsible for the acts of such other party, in the absence of some prior agreement or conspiracy between him and such other party.

Appellant also complains of the court's charge on manslaughter, claiming that it was too restrictive, and limited appellant's rights to the firing which occurred when the parties approached the house, and did

not authorize the jury to consider what occurred during the conflict. On another trial we would suggest that the court might by a fuller charge remove any objection on this account.

Appellant urgently insists that the court committed an error in refusing his special requested instructions numbers 2 and 3, which are as follows:

"(2) Having in view the foregoing charge, the jury are further instructed that, under the facts, before they would be authorized to convict defendant of murder in either the first or second degrees, they must first find from the evidence that, at the death of Henry Schnabel, the sheriff, R. M. Glover, with whom and under whom Schnabel was acting, was in the act of making, or attempting to make, a legal arrest, and unless you should so find you should acquit defendant of murder, and then proceed to inquire whether or not, under the evidence, defendant is guilty of manslaughter.

"(3) In connection with the foregoing charge number 2, the jury are instructed that where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the person accused of such felony. In order to make the attempted arrest of defendant by Glover lawful (if you believe that at the time of the killing of Henry Schnabel, Glover was making such attempt), you must find the existence of all the following facts, to wit: (1) That Glover, as sheriff, had satisfactory proof that defendant had committed a felonious killing of W. T. Morris, in Karnes County; (2) that such proof had been made upon the representation of a credible person; (3) that the defendant was about to escape; and (4) that Glover had no time to procure a warrant for defendant's arrest; or (5) that if he had time to procure such warrant he made no effort to do so. The absence of any one or more of these facts would make the attempted arrest unlawful, and you should in that event so find."

The court does not appear to have given any charge on the subject of arrest. It does occur to us that a charge on this subject should have been given, because if there was no purpose on the part of the sheriff, and those with him, to find and arrest appellant for the killing of Sheriff Morris, then the acts of himself and those accompanying him were without excuse. True, something is said in the testimony about arresting Bonifacio, but it occurs to us that this was a mere pretext. Even if this was the purpose, the rights of the parties in this connection should have been explained by the charge of the court. Undoubtedly the object of the posse in going to the house of Martin Roblero was to arrest appellant for the killing of Sheriff Morris. There is no claim that they had a warrant. Therefore the law authorizing an arrest without warrant should have been given, and the rights of the sheriff and his posse in executing the arrest should also have been stated to the jury. It does not follow from this that appellant would have been justified in resisting an illegal

arrest without warrant. If he did not give the sheriff time to declare his purpose, but fired on him and his posse, then he could not claim self-defense. Or if he had determined beforehand not to be arrested, and to resist arrest at all hazards, and before the sheriff or his posse put him in jeopardy of life or serious bodily injury, real or apparent, he drew his weapon and began firing, in that event he would not be guiltless. If, on the other hand, the sheriff and his posse, without any warrant, having no time to procure one, charged upon defendant, and without any notification of their purpose to arrest him before firing upon him, he would have the right to resist such attempt. In our·opinion, the court should have given the law on this subject fully. For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*