## LUZ SANCHEZ AND FRANCISCO GAMBOA v. THE STATE.

### No. 2374. Decided April 16, 1913.

**1.—Assault to Murder—Severance—Practice.**

Where defendants filed a motion to sever, which the court overruled, the same was reversible error, as they had not only the right of severance, but to direct which one should first be placed on trial. Following Teiman v. State, 28 Texas Crim. App., 144, and other cases.

**2.—Same—Charge of Court—Illegal Arrest.**

Where, upon trial of assault with intent to murder, the question of an illegal arrest was raised by the evidence, the court should have submitted this issue to the jury, and a failure to do so was reversible error.

**3.—Same—Provoking Difficulty—Charge of Court.**

Where, upon trial of assault with intent to murder, there was no evidence that the defendant provoked the difficulty, a charge of the court submitting this issue was reversible error. Following McCandless v. State, 42 Texas Crim. Rep., 58, and other cases.

**4.—Same—Insufficiency of the Evidence.**

Where, upon trial of two defendants of an assault with intent to murder, the evidence showed that one of the defendants did not participate in the diffi-

culty and had no connection with it, the conviction was not sustained against him.

**5.—Same—Insufficiency of the Evidence.**

Where, upon trial of assault to murder, the evidence showed that the defendant was acting in self-defense and in the defense of his house and family against an unwarranted assault by officers who had no warrant, the conviction could not be sustained.

**6.—Same—Aggravated Assault—Charge of Court.**

Where, upon trial of assault to murder, the evidence raised the issue of aggravated assault, the court should have submitted a charge thereon, and a failure to do so was reversible error.

**7.—Same—Assault to Murder—Charge of Court—Mitigating Circumstances.**

Where, upon trial of assault to murder, the evidence raised the issue of self-defense and mitigating and extenuating circumstances, the court should have charged the jury thereon, and a failure to do so was reversible error.

Appeal from the District Court of Hidalgo. Tried below before the Hon. W. B. Hopkins.

Appeal from a conviction of assault with intent to murder; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*J. T. Canales* and *W. J. Dougherty* and *E. C. Gaines,* for appellant.—On question of severance: King v. State, 35 Texas Crim. Rep., 472; Willeys v. State, 22 Texas Crim. App., 408; Teiman v. State, 28 Texas Crim. App., 144.

On question of illegal arrest: Cortez v. State, 43 Texas Crim. Rep., 375, id., 44 id., 169; Earles v. State, 52 Texas Crim. Rep., 140; Montgomery v. State, 43 id., 304.

On question of provoking the difficulty: Branch Crim. Law, sec. 467, and cases cited in opinion.

*C. E. Lane,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—The indictment charges the two above named defendants and Avelino Garza Mercado jointly with assault with intent to murder Jesse Perez. When the case was called for trial motion was made to sever, which was granted as to Mercado. Thereupon the other two defendants, Sanchez and Gamboa, also asked a severance, which was refused by the court. They were placed upon trial and convicted, each being awarded five years in the penitentiary.

Error is assigned upon the ruling of the court refusing the motion to sever as between Sanchez and Gamboa. This was error. These parties had a right to sever, and not only so, but the further right to direct the order of trial on the severance as to which one should be placed on his trial. Teiman v. State, 28 Texas Crim. App., 144, is directly in point and adjudicates the very question. See also Wallace v. State, 48 Texas Crim. Rep., 318; Brooks v. State, 42 Texas Crim. Rep., 347.

In order to intelligently review some of the questions thought necessary to be decided a short statement of the case should be made. Appellant Sanchez was charged with horse theft. There was no offense charged against Gamboa so far as the record is concerned. This applies to arrest of appellants at time this particular offense is charged. Either in March or May, which is left in doubt by the testimony of Perez; he was deputy sheriff, and as such went to the residence of Sanchez for the purpose of arresting him for the alleged horse theft. Sànchez was not at home, but his wife was. He inquired of her and ascertained that Sanchez was not at home, and went away. He claims to have had process then for the arrest of Sanchez. On the 5th or 6th of June he returned to the home of Sanchez for the purpose of arresting him, stating that he had a capias for his arrest for the horse theft. He also states that he had a warrant for the arrest of Mercado for assault to murder, "but had no papers for Gamboa or any other person." Sanchez lived on the Rio Grande near the Ojo de Agua ranch. They went in an auto, stopping some distance beyond the residence of Perez, reaching that point some time after midnight. Just before day they surrounded the house of Sanchez for the purpose of arresting him. Reaching the house of Sanchez about daylight or a little before—the witnesses differ somewhat as to the time of night, some saying that light was just breaking for day and others that it was dark—Perez and his posse surrounded the house of Sanchez. The house had two doors, one entering from the north, and one entering from the south. It also had a couple of windows, and a little hole in the wall smaller than the window. There were several Mexicans at the house of Sanchez who had spent the night, besides appellants, Victoriano Cantu, Manuel Cantu, Mercado, Mrs. Sanchez, her niece Geniveva Santana, and his little daughter. The women slept in the house, and the men on pallets on the south side and outside of the house. When Mrs. Sanchez opened the north door to pass out to attend a call of nature, seeing the dim outline of men in the brush near the house, started to re-enter, when one of the men who was secreted nearest the house prevented her returning. This man seems to have been Perez. When she gave the alarm by calling her husband, this aroused the men on the opposite side of the house and all with the exception of one of the Cantus ran into the house and the shooting began. The evidence is in direct conflict as to who began the shooting, those in the house or those on the outside. Perez stated that he said "surrender" just as the shooting began, but by none of the testimony is it claimed or intimated that he notified those in the house of his identity or the identity of those with him, or the purpose for which he demanded the surrender, nor was the name of any of the parties mentioned in his demand, nor was it shown or intimated that he mentioned the person accused, or by what authority the surrender was demanded. There were quite a number of shots fired. Finally after further demand the parties came out of the house, there being four Mexicans in the house. Upon entering the house they found some

shells upon the floor, indicating they had been freshly fired. The two little girls were in the house. One of the Cantus did not enter the house, but fled. He was killed while running away from the house. Mrs. Sanchez testified contradicting the evidence of Perez to the effect that she had seen him on a previous visit in March or May whichever occasion was correct; that she had never seen Perez, and he had never been to her house before the occasion of the difficulty; that is the first time she had ever seen him at her house, and that she had never seen him until the shooting. Perez's testimony to some extent corroborates her in this; that on the trip in June he took Antonio Sandoval to take him to Luz Sanchez's house, that "He told me that he lived there and I found him there." The trip in June was the only one on which Sandoval accompanied Perez. There is also a sharply contested issue as to whether Perez in fact had had process in his possession on the 6th of June or prior thereto, the 6th of June being the night of the shooting. It is also controverted issue as to whether at that time any process had been in fact issued for the arrest of Sanchez. Bearing upon this on the trial of the case before the jury the State first offered and identified by Perez a capias issued October 29, after the difficulty in June, bearing Perez's official return of the arrest of appellant. He had previously testified in a most positive manner he never held in his possession or made any return on but one capias relating to these matters. After the noon recess of court Perez brought into court another capias dated prior to June 6th, which he then claimed to have found among his private papers at the noon hour. He had previousy testified he had never had but one capias, and that was the one, on which the return was made. As before stated, Perez and his crowd surrounded the house of Sanchez, and when Mrs. Sanchez gave notice of the fact that these men were in hiding on the north side of the house, she holloed to her husband to look out, they were going to kill him. Perez testified that she holloed "Luz! Luz! Luz!" three times. Upon whatever exclamation she did make, the men who were sleeping outside on pallets, except Cantu, who was killed while he was fleeing, ran into the house. The evidence is positive for the State that the first shot was fired from the inside of the house, while that for the appellants is as positive it was fired by the officers on the north side of the house where Mrs. Sanchez was. Perez, the alleged assaulted party, was on that side of the house.

The court did not charge upon the issue of arrest and the law applicable to illegal arrest in any of its aspects. This is assigned as error in a timely and sufficiently legal manner both in the trial court and in this court. The question of an attempted illegal arrest is fully raised by this record under the evidence. It is not claimed the officers notified the defendant or any of the parties as to who they were, or what was their mission. They approached the defendant's house in the night-time. There is some testimony to the effect that appellant Sanchez may have been mixed up with the border troubles. In one place Perez says one time Sanchez had seventeen men with him. At the time of

this difficulty all parties were armed with 30-30 rifles and implements of destructive warfare. These were strangers approaching appellant's house at night and surrounding it, armed and shooting into his house with no notification as to who they were except a demand that they "surrender." The evidence also, as before stated, is in direct conflict as to who began the shooting, it being equally positive both ways, but there is no question of the fact that these armed men, strangers to appellant, approached his house and surrounded it at night. Why the different phases of the law pertaining to illegal arrest was not charged in this case we do not understand, for under all the authorities it is a self-evident proposition. See Montgomery v. State, 43 Texas Crim. Rep., 304; Cortez v. State, 43 Texas Crim. Rep., 375; Cortez v. State, 44 Texas Crim. Rep., 169; Earles v. State, 52 Texas Crim. Rep., 140; Branch's Crim. Law, secs. 437, 438 and 439 for many cases and tersely stated propositions supported by the cited cases. We do not think it would serve any useful purpose to go over and state the different rules applicable to the attempted illegal arrest in its different phases as applicable to the evidence adduced on the trial. There was an issue as to whether Perez had a warrant for the arrest of appellants. This phase of the law should have been charged. It was an illegal and reckless manner in which the arrest was sought to be made. There was an approach of strangers to appellant's house, surrounding it at night, demanding a surrender without giving a reason for it, as even viewed from the State's testimony; without even notifying them they were officers, or their mission for being around his house at that peculiar hour of the night. These matters will suggest themselves to the trial court upon a review of the authorities. Appellants' legal rights and legal status with reference to this matter as well as the attitude of the officers under the circumstances detailed by both sides should be carefully noticed in the instructions of the court to the jury.

Without recapitulating the evidence we hold that the court erred in giving a charge on provoking a difficulty. How it could be held that appellant provoked the difficulty in this case is not to be ascertained from the facts. He was asleep when the strangers surrounded his house at night. He ran into the house, and if the State's theory is correct, began shooting at his supposed armed enemies under those circumstances. If the officers fired first, of course he did not provoke the difficulty from that standpoint. If he fired first, this was not a provocation of the difficulty. Under no authority that has been called to our attention can it be held that the issue of provoking a difficulty was in this case. We hardly deem it necessary to cite authorities on this issue, but would refer to Branch's Crim. Law, sec. 467; McCandless v. State, 42 Texas Crim. Rep., 58; Bearden v. State, 46 Texas Crim. Rep., 144.

It is also contended that the evidence is not sufficient to support a conviction against Gamboa. The contention is that there is no evidence against Gamboa that he participated in the difficulty in any way,

and further, that the testimony without contradiction shows that he not only did not participate in the difficulty but secreted and hid himself under a bed to avoid being shot by the parties outside. The evidence is uncontroverted in this record, as we understand it, that immediately upon Gamboa entering the house he crawled under the bed and remained under it until after the shooting. This is shown by all the evidence bearing on the question.

It is also contended that Sanchez is not guilty under the evidence of assault to murder. The writer believes this proposition is correct. No testimony in the case shows that any shots were fired until he was awakened by his wife notifying him that they were going to kill him. He then ran in the house, secured his gun and shot. The State's case is appellant fired first. The defendant's case is the officers fired first. But if we take the State's side of the case, we do not believe this testimony makes a case of assault to murder. And the writer would go further and state that under the State's evidence Sanchez ought not to have been convicted. How a man could be sent to the penitentiary under the circumstances detailed in this case for resisting and fighting unknown parties,—men surrounding his house at night armed with rifles and deadly arms, and shooting at him, I do not understand. To send a man to the penitentiary under those circumstances would deny him the right of defending not only himself but his house, his castle, in which was his wife, little daughter and niece.

If the case should be tried again in connection with the facts and the attempted arrest, a charge on aggravated assault should be given. This testimony certainly demands a charge on aggravated assault if it demanded any sort of charge as a predicate for conviction. The attempted illegal arrest, the manner of surrounding the house, and all the attendant circumstances were such as to place any reasonable mind in such condition that it would be absolutely incapable of cool reflection.

The charge submitting the issue of assault to murder while not specifically complained of is erroneous. This is mentioned in view of another trial so a proper charge on this matter may be given. It reads as follows: "If from the evidence you are satisfied beyond a reasonable doubt that the defendant, Luz Sanchez, and Francisco Gamboa, or either of them, on or about the time charged in the indictment, in the County of Hidalgo and State of Texas, with a deadly weapon, and with malice aforethought, did assault the said Jesse Perez, with intent then and there to kill and murder him, by the means charged in the indictment; and if you are further satisfied by the evidence, beyond a reasonable doubt that said assault was not made in defense of himself, or themselves, against an unlawful attack producing a reasonable expectation or fear of death or serious bodily injury, then you will find the defendants or either of them guilty of an assault with intent to murder, and so say by your verdict," etc. The court then charges the law of principals and the law of self-defense. Nowhere in connection with malice aforethought or assault to murder does the court instruct

the jury with reference to any mitigating or extenuating circumstances. We have said enough already with reference to the facts and circumstances to show that there were other issues in the case besides assault to murder and self-defense, and the court should have instructed the jury in connection with this phase of the law and limited malice aforethought and assault to murder by these extenuating circumstances. There were facts in the case growing out of the issues of illegal arrest and connecting circumstances that extenuated this difficulty, even if appellant was in the wrong. The jury gave them five years each. This is three years in excess of the minimum punishment of assault to murder.

For the reasons indicated the judgment is reversed and the cause is remanded.

*Reversed and remanded.*