JOHN STEWART AND BARNEY MACKLEY V. THE STATE.

No. 3414.   Decided March 10, 1915.

Rehearing denied April 7, 1915.

**1.—Murder—Illegal Arrest—Charge of Court.**

Where, upon trial of murder, the evidence raised the issue of an attempted illegal arrest by deceased and his companion of the defendants, and the court submitted this issue in a proper charge as well as self-defense in connection therewith, there was no reversible error. Following Miller v. State, 32 Texas Crim. Rep., 319, and other cases.   Davidson, Judge, dissenting.

**2.—Same—Rule Stated—Arrest—Private Person—Escape.**

Where the law provides that a private person may arrest one who has ·committed a felony and is escaping or attempting to escape, and defendant knows deceased's purpose, his killing deceased by resisting and shooting him ·constitutes murder, although deceased did not inform defendant that he was an officer of the law, etc.

**·3.—Same—Rule Stated—Arrest Without Warrant.**

It is both the right and the duty of a private person who is present when a felony is committed to apprehend the felon without waiting for the issuance of a warrant, and the arrest may be made at any subsequent time as well as at the time of the commission of the felony. Following Staples v. State, 14 Texas Crim. App., 136, and other cases.

**4.—Same—Case Stated—Murder—Attempted Arrest.**

Where, upon trial of murder, the evidence showed the defendants in the dead hour of the night attempted to burglarize, if they did not at first actually burglarize said house, and that, just before they had fully completed the burglary, they were frightened away by the companion of the deceased who ·communicated the fact to him; that deceased and his companion armed them-selves and awaited their return in plain view of the reflection of the hotel lights, when defendants returned heavily armed to complete the burglary, when they were again frightened away upon seeing deceased and his companion who hailed them and they attempted to escape and thereupon shot and killed the ·deceased, the conviction of murder was sustained under a proper charge of the court.   Davidson, Judge, dissenting.

**·5.—Same—Self-defense—Charge of Court—Attempted Arrest.**

Where, upon trial of murder, the evidence raised the issue of self-defense in connection with the attempted arrest by deceased and his companion of defendants, and the court submitted this issue, there was no error in not sub-mitting self-defense independent of said attempted arrest. Davidson, Judge, dis-:senting.

**6.—Same—Evidence—Burglary—Attempted Arrest.**

Where, upon trial of murder, the evidence disclosed that the deceased and his companion attempted to arrest the defendants, who were found in the act of committing burglary and when they were detected, attempted to escape, there was no error in admitting all the circumstances surrounding the transaction ·of the burglary or attempted burglary, and which led to the identification of the defendants as the persons who were engaged therein. Following Jacobs v. State, 28 Texas Crim. App., 79, and other cases.   Davidson, Judge, dissenting.

**·7.—Same—Fugitives from Justice—Notice of Arrest—Rule Stated.**

Where the parties attempted to be arrested were at the time fugitives from justice and attempted to escape while detected in the commission of a felony, they were thereby charged with notice of the object of the persons in pursuing and attempting to arrest them. Following Cortez v. State, 43 Texas Crim. Rep., 315, and other cases.

**8.—Same—Arrest—Charge of Court—Notice of Purpose to Arrest.**

Where, upon trial of murder, the evidence showed that defendants while attempting to escape when they were detected by deceased and his companion in attempting to commit the offense of burglary, if they had not already committed same, and deceased and his companion hailed and attempted to arrest them, when they turned and shot and killed deceased, and the court, in his charge, instructed the jury that it was the duty of the deceased and his companion to inform the defendants of their purpose, if they had time or opportunity to do so and the defendants' right to resist illegal arrest, and also submitted the right of self-defense in such event, a conviction of murder will not be disturbed, under the facts of this case. Davidson, Judge, dissenting.

**9.—Same—Rule Stated—Arrest—Notice of Arrest.**

If a party about to be arrested knows the capacity and purpose of the officer, it is not necessary for the officer to make known said purpose or in what capacity he is acting, and where, upon trial of murder, the defendants must have known when they attempted to escape when they were detected by the deceased and his companion in the commission of burglary, the purpose of deceased and his companion to arrest them for such offense, and, thereupon, turned upon them and shot and killed deceased, they were guilty of murder under a proper charge of the court. Following Miller v. State, 31 Texas Crim. Rep., 609, and other cases. Davidson, Judge, dissenting.

Appeal from the District Court of Dallam. Tried below before the Hon. R. E. Stalcup, Special Judge.

Appeal from a conviction of murder; penalty, fifty years imprisonment for each defendant.

The opinion states the case.

*Frank M. Tatum* and *J. Y. Powell* and *Tom Collins* and *J. Y. Synnott,* for appellant.—On question of admitting testimony that prior to the alleged homicide there had been committed or was an attempt to commit burglary: Miers v. State, 29 S. W. Rep., 1074; Lynch v. State, 41 Texas Crim. Rep., 510; Cortez v. State, 44 id., 169.

On question of unlawful arrest: King v. State, 13 Texas Crim. App., 277; Hunnicutt v. State, 20 id., 632; Cline v. State, 28 S. W. Rep., 684.

On question of self-defense: Tillery v. State, 24 Texas Crim. App., 251; Patillo v. State, 22 id., 586; Bell v. State, 20 id., 445; Jacks v. State, 32 Texas Crim. Rep., 192; Gonzales v. State, 28 Texas Crim. App., 130; Reed v. State, 32 Texas Crim. Rep., 25.

*C. C. McDonald,* Assistant Attorney General, for the State.—On question of arrest: Smith v. State, 13 Texas Crim. App., 507; Staples v. State, 14 id., 136; Hill v. State, 35 Texas Crim. Rep., 371.

PRENDERGAST, Presiding Judge.—Both appellants were convicted of murder and their punishment assessed at fifty years each in the penitentiary.

The facts, and the inferences therefrom, are uncontroverted. Appellants introduced no witnesses or other evidence. Neither testified. It is unnecessary to give in detail the evidence of the respective witnesses. Instead we will give substantially the facts as established by the evi-

dence as a whole, and the reasonable inferences which the jury were authorized to draw therefrom. In addition, we may state what some particular witness testified as to some issues.

Just about night on August 19, 1914, appellants in a one-horse vehicle stopped and camped about three-quarters of a mile south from the town of Texline in said county. That night between about 12 and 1 o'clock they attempted to burglarize, and perhaps also actually burglarized, the storehouse of Mr. Bingham, called Bingham's Hardware Store, in said town. This store fronted about north on one of the town streets. The Garvey Hotel fronted the same street and direction, and was east of Bingham's, a vacant lot twenty-eight feet wide separating the two buildings. Fronting the same street and direction with a like vacant lot on the west, was the Caddell store building. East and adjoining the Garvey Hotel and a part of the same building, Garvey had a little grocery store. Directly across the street, opposite the Garvey Hotel, fronting about south, was the Timmons store.

The entrance to the Bingham store was in the center thereof. The doors were set back some three feet from the line of the front. On the front line were double swinging screen doors, not locked or fastened, opening in the center. Slanting from the fastenings of the screen doors to the store doors proper on either side were glass windows, the two sashes in each being eighteen inches wide and some fifty-four inches high, thus making a vestibule in the center of the door at the entrance. On each side of the store front were two large glass windows, two sashes in each twenty-eight inches wide and fifty-four inches high, thus making the entire front of glass, except the door and the stops between the windows. The sash in each of these front windows were fastened therein by quarter round mold and putty.

The deceased, R. C. Brownlee, his brother-in-law, John Garvey, and Mr. Henderson had been out of town in a livery rig, hunting and fishing. They returned to town about 11:30 on the night of August 19th, drove up in front of the Garvey Hotel, where deceased Brownlee's wife and baby were staying. The hotel folks were her parents. Brownlee then got out of the conveyance and went to where his wife and baby were in the hotel. His brother-in-law Garvey and Mr. Henderson then drove the livery rig to the stable, some three blocks distant, where they put it up. They then went with the night telegraph operator to the depot and remained there some thirty or forty minutes. Leaving there they started to their homes. Going a short distance in the same direction, Henderson left Garvey, going to his home, and Garvey continued to said hotel, his home. Garvey passed along on the sidewalk in front of the Caddell store, which had a concrete walk. The walk between the Caddell and Bingham stores was dirt and cinders. So it was in front of the Bingham store. When Garvey reached the corner of the Bingham store, next to Caddell's, he saw appellants emerge from the Bingham screen doors, and heard those doors slam. When they came out of the screen doors "they were at a fast pace, as if they were scared." They went to the end of the Bingham's porch towards the hotel, turned into

the middle of the street and Garvey lost sight of them. It was a dark night. Garvey then went on to the hotel and told Brownlee, and Brownlee said, "We will go out and see if we can see them." Mrs. Brownlee said that when her brother John Garvey came into the hotel at that time, she said: "When John returned he told my husband that somebody was trying to get into Bingham's Hardware Store."

John Garvey and Brownlee, deceased, then got their shotguns, went down on the sidewalk, and sat down on a little bench in front of the Garvey store, adjoining the hotel. In the hotel was a swinging lamp, the light from which reflected on Garvey and deceased while they were thus sitting on this bench watching. In seven or eight minutes from the time Garvey saw appellants emerge, as stated, from said Bingham's screen doors, he and Brownlee saw them return to the scene. They first stopped in front of Dyke's Drug Store, which seems to have been across the street but not exactly in front of Bingham's. They remained there about a minute, evidently watching and listening to see if they were seen. They then angled down in front of Bingham's. They reached the hitchrack right in front of Bingham's store. John Garvey said: "When they got to the hitchrack in front of Bingham's store they saw us sitting in the light and turned right quick and angled down the street in front of Timmons, keeping in the street. At that time we had been sitting on the porch of the hotel about seven or eight minutes, the light from the hotel shining on us,—our guns with us. I do not know whether or not the guns were within the view,—within plain view. We were in plain view, but I don't know where we had our guns. They were not under our clothes, but I don't know where we had our guns. They were not under our clothes, but were in plain view, but I don't know whether a man could have seen them at a distance. Those persons (appellants) never saw us until they got right in front of Bingham's. We were out in the light and could see them and they could see us and they did see us, but I don't think they could see our guns that far." He further said that as soon as appellants got in front of the hardware store and saw them, they turned over to the other side of the street in a fast walk. He and Brownlee, as they got opposite them, went towards them. Garvey further said: "When they (appellants) left the front of Bingham's store and went to the front of Timmons' store, they crossed the street and traveled in a fast walk; and when they got in front of Timmons' store, inasmuch as we had seen them go back to the hardware store—we thought that it was our duty to arrest them, if we could do so. We went out in the street to make the arrest. We thought they were going into this (Bingham's) store, and we went out and they branched on the opposite side of the street from where we were sitting, and Brownlee said, 'What are you fellows doing here at this time of night?' They both started off without answering. They traveled away from us down Second Street toward the water trough. Brownlee spoke loud enough for them to hear and then said to them, 'Halt,' twice. The first time that Brownlee called to these parties to stop they started in a fast run, Brownlee

starting to raise his gun, as he called to them to halt the second time. Just as he raised his gun, they commenced shooting, and they shot once, or maybe twice, before he started to shoot. I ran to a telephone post to get in the dark, and Brownlee stood in the light, which shone into the street from the hotel. The men were in the dark. They were running when Brownlee said 'Halt' the second time, and they shot back while running. They fired five shots and we fired three. Brownlee fired two of them and myself one. We used No. 4 shot in shotguns." The evidence by other witnesses would clearly justify the jury to have believed that appellants shot at Garvey and Brownlee more than twice, perhaps the five times, before Brownlee or Garvey either shot. Garvey was not hit; neither of appellants was hit with the shots. Brownlee was shot with a 32-caliber ball, from which he died a few hours later. This shooting is shown to have occurred at about 1 o'clock a. m. or just after.

Appellants went at once to their camp, hitched up and left, going south, attempting to escape. The exact time they left their camp could not be shown, but it was before daylight. They were seen the next morning about sunup some eight miles south. They were arrested that morning between 9 and 10 o'clock and they and their outfit searched. They had two pistols,—one a 32-caliber, which had been freshly fired.

Soon after the shooting, parties began to investigate whether the Bingham store had been burglarized; they found the store doors intact, but one of the large panes of glass, twenty-eight by fifty-four inches, in the front of the store, nearest to the Caddell store, had been removed by appellants. The tool or instrument with which it had been removed was found on the person of one of appellants the next morning when they were arrested. It was absolutely demonstrated that said pane of glass had been removed with this instrument. It was fitted in the places where the molding and putty had been removed by them, and there can be no sort of doubt but that they removed this pane of glass to burglarize the store. The glass and molding itself was also found leaning against the fence at the vacant lot, which separated the Bingham and Caddell stores. Appellants were tracked from the Bingham store to their camp, and their horse and vehicle were tracked from there to where they were arrested. Their tracks and the horse tracks were measured and identified with their tracks and the horse tracks, beyond any doubt.

The evidence would clearly authorize the inference that appellants were about said Bingham's store with the intention and preparing to burglarize it when the deceased, Garvey and Henderson returned from their hunt and drove up in front of the hotel and that they were then and thereby frightened away from it. But whether that is true or not, it is certain that just before 1 o'clock they removed said glass to burglarize said store, and when they heard Garvey approaching they attempted to secrete themselves in said vestibule, but realizing Garvey would necessarily pass immediately in front of the vestibule, in order to prevent being caught therein and to escape detection and appre-

hension, they immediately and hastily departed therefrom. When Garvey passed along going to the hotel, without then saying anything to them, they waited the seven or eight minutes, assuming, of course, that Garvey would go on to bed and that they would not be further interrupted. They returned after this lapse of time to the scene and reconnoitered. Seeing and hearing no one at first there can be no shadow of doubt that they then approached said Bingham's store again with the intention and purpose of burglarizing it, and their efforts and maneuvers then seen by both Brownlee and Garvey clearly justified them to conclude, as they did, that appellants were approaching said store again in an attempt to burglarize it. No other reasonable conclusion could have been drawn from all the facts and circumstances then seen and known by Garvey, and in connection with what Brownlee had been told before, also by him. Under such circumstances we think it clear that Brownlee and Garvey, each and both, then had the right, if it was not their duty, to arrest appellants, which they, in a proper way, attempted.

This case was tried in the court below on the theory by the State and the trial judge that the evidence raised the issue of murder and of manslaughter, and self-defense in connection with the attempted arrest of appellants and as a part of that attempted arrest. On that theory the court, in his charge, clearly submitted these three issues.

On the contrary, the appellants and their attorneys contended that murder in no event was raised; neither was manslaughter, and that in addition to self-defense in connection with their attempted arrest, self-defense, independent and separate from that, was also raised. In the trial these issues were fought out. Appellants, by objections to some of the evidence, by objections to the court's charge and by charges requested, properly raised and preserved these questions.

After a careful and thorough investigation and study of this record and the law applicable thereto, we have reached the conclusion that the State's contention and the view of the trial judge was correct and that of appellants not correct. Hence, it will not be necessary for us to take up each, the objection to the evidence, the court's charge, and appellants' refused requested charges and discuss them separately. What we have to say, however, will apply to all of them.

Our statute (art. 1303, P. C.) not only makes it a felony to commit the complete offense of burglary, but also (art. 1320, P. C.) makes it a felony for any person to attempt to commit burglary. The next article defines an attempt as "an endeavor to accomplish the crime of burglary carried beyond mere preparation, but falling short of the ultimate design in any part of it." These statutes were correctly given to the jury by the trial judge and applied in his charge.

Article 259, Code of Criminal Procedure, says: "A peace officer or *any other person* may, without warrant, arrest an offender when the offense is committed in his presence or within his view, if the offense is one classed as a felony."

Article 263, Code of Criminal Procedure, is: "In all the cases enumerated where arrests may be lawfully made without warrant, the

officer or *other person* making the arrest is justified in adopting all the measures which he might adopt in cases of arrest under warrant. . . ."

Article 288, Code of Criminal Procedure, is: "In making an arrest, all reasonable means are permitted to be used to effect it. No greater force, however, shall be resorted to than is necessary to secure the arrest and detention of the accused."

Article 290, Code of Criminal Procedure, is: "In executing a warrant of arrest, ·it shall always be made known to the person accused under what authority the arrest is made; and, if requested, the warrant shall be exhibited to him."

These statutes, in effect, were given in charge to the jury in this case and applied to the issues raised.

In the case of Miller v. State, 32 Texas Crim. Rep., 319, appellant therein was convicted of murder in the first degree with the death penalty assessed and affirmed. The homicide in that case arose out of an attempt to arrest him for the offense of unlawfully carrying a pistol. At the time he was in his own house and was not then so carrying or charged with then carrying such pistol. The officers, one of whom he killed, had been informed before then that he, on a previous occasion,— not then—had unlawfully carried a pistol. They had no warrant, and no complaint had been made against him. They were attempting to arrest him for said misdemeanor without ·complaint or warrant. On appeal he contended that his attempted arrest was unlawful and he had the right to kill the deceased in resisting such unlawful arrest. Judge Hurt, for the court, ·in that case, discussing that point, said:

"Counsel for appellant contend earnestly that the evidence does not warrant a conviction for murder in the first degree. We will discuss this question from two points of view: First, that the attempted arrest was illegal; second, that it was legal. A man will not be justified, if he kill in defense against an illegal arrest of an ordinary character, yet the law sets such a high value upon the liberty of the citizen that an attempt to arrest him unlawfully is esteemed a great provocation, such as may reduce a killing in resistance of such an arrest to manslaughter. But while this is the general rule, yet the killing may be done under such circumstances of deliberation or cruelty as will afford proof of express malice, in which case it will be murder of the first degree (Galvin v. State, 6 Colo., 292; Roberts v. State, 14 Mo., 138), as when the killing be done with a weapon‘ deliberately prepared beforehand to resist the illegal arrest. Rex v. Patience, 7 Car. & P., 775.

"A is expecting an attempt will be made to arrest him illegally. He deliberately prepares his arms for immediate use, calmly and deliberately determines to kill the person who attempts the arrest. B appears with intention of making the arrest. A immediately shoots and kills B. A would be guilty of murder upon express malice, though the intended arrest was illegal. To hold A guilty of murder upon express malice would not only be law, but common sense and justice. Applying the facts of this case to this rule of law, we would hesitate before reversing

the judgment for insufficiency of the evidence, though the attempted arrest was unlawful."

In the recent work of Michie on Homicide, vol. 1, p. 130, he says:

"A private person may, in a temperate manner and without a warrant, arrest one who has just committed a felony; and it is murder for the person so attempted to be arrested to kill one whom he knows is in fresh pursuit and endeavoring to arrest him for such felony. Where a citizen attempts to arrest a person who has committed a felony without a warrant, and such accused intentionally kills him, he is guilty of murder in the first degree. Under a statute which declares that any person who kills a private citizen endeavoring to apprehend a criminal, knowing the intention with which such private citizen interposes, is guilty of murder, the State must prove that the defendant, who shot his pursuer, was a criminal, that deceased was endeavoring to apprehend him when shot, and that defendant then knew deceased's purpose.

"Where the law provides that a private person may arrest one who has committed a felony, and is escaping or attempting to escape, and defendant knows deceased's purpose, his killing deceased, by resisting and shooting him constitutes murder, although deceased did not inform defendant that he was an officer of the law.

"Where a person has been apprehended in the commission of a felony, notice of the crime and the purpose of pursuit, by one endeavoring to arrest him for such crime, is not necessary."

In 3 Cyc., p. 884, it is said: "It is both the right and the duty of a private person who is present when a felony is committed to apprehend the felon without waiting for the issuance of a warrant; and the arrest may be made at any subsequent time as well as at the time of the commission of the felony. So, too, he may arrest without a warrant one whom he finds attempting to commit a felony." In a footnote following said text, citing cases, it is said: "To make such an arrest legal it is not necessary that the person should have, at the time he is arrested, a continuing purpose to commit the felony and that he may be arrested, though that purpose is wholly ended, provided the arrest is made upon fresh pursuit."

Presiding Judge White, in Staples v. State, 14 Texas Crim. App., 136, p. 139, says:

"In discussing the reasons for, and circumstances justifying, an arrest without warrant in civil actions for damages, that great and learned philosophical law thinker and writer, Mr. Cooley, says: 'There are sometimes circumstances which in themselves are a command of arrest as imperative as could any command by official authority. These cases in general are plain, and they rest upon the inherent right of society to defend itself against sudden assaults, not by regular proceedings merely, but in emergencies, by the spontaneous actions of its members. In all civil cases it is not supposed that public justice will suffer, or that anyone can be seriously injured or incommoded, by any

Vol. 76 Crim.-29

such delay in arresting a wrongdoer as may be required to obtain proper legal process. Neither in general can any similar delay be supposed prejudicial in the case of minor offenses against the State. But it may be reasonably expected that a felon will flee from justice if an opportunity is afforded him, and also that if he knows he is suspected he will do what may be in his power to obliterate the evidences of his crime. In these circumstances are found forcible reasons for prompt action in his arrest. . . . When the propriety of an arrest without process is in question, the problem is always how to harmonize the individual right to liberty with the public right to protection. Where process issues, the proceedings required in obtaining it constitutes a sufficient precaution against causeless arrests; the magistrate decides on the facts presented to him that sufficient reason exists. But if one without this protection were to arrest upon his own judgment, he ought to be able, when called upon, to show that his judgment was warranted. To do this he should show either, first, a felony actually committed; second, facts that had come to his knowledge which justified him in suspecting the person arrested to be the felon; or, third, a felony being committed, an arrest to stay and prevent it. This seems to be the least that could be required; the fact of felony and personal knowledge of the guilt of the particular person, or reason for suspecting him; and if one errs in these particulars it is better that he be left to take the consequences than that they be visited upon an innocent party who is improperly arrested.' "

The evidence in this case, without contradiction, unquestionably shows that appellants in the dead hours of the night, after midnight, attempted to burglarize, if they did not at first actually burglarize, Bingham's store; that just before they had fully completed the burglary and the theft from the house, they were frightened away from it by Garvey, who at once communicated the facts to his brother-in-law, Brownlee, the deceased; that in seven or eight minutes thereafter, not having completed the burglary of said store to their full satisfaction, they returned thereto for the purpose of completing the burglary,— attempting to burglarize the house. Under the circumstances and facts of this case, they could have returned for no other purpose. They were then armed to the teeth with pistols to resist arrest by whomsoever attempted. When detected in their last attempt and again frightened away from said building, their actions demonstrated that they not only intended to flee from arrest but actually murder, as they did, whoever attempted to prevent their escape or arrest them. Deceased and Garvey were in their plain view from the reflection of the hotel light. Garvey and Brownlee approached them in a proper manner, first hailing them to know what they were doing there at that time of night. They not only gave no answer to this inquiry but they proceeded to attempt to escape. They knew that they had just committed one, if not two, felonies, actual burglary, or attempt to burglarize. When hailed they not only made no answer, but they made no inquiry of the object or purpose of Brownlee and Garvey in accosting them. When called to

to halt, they did not do so. When called to halt a second time they made no response, except to shoot again and again at Garvey and Brownlee; they did not and could not know that Garvey and Brownlee were private persons and not officers. Neither did they know, nor could they have known, that these parties had no warrant for their arrest; they did not stop to inquire. Why? Because they knew that these parties were then undertaking to arrest them for felonies they knew they had just committed and, instead of submitting to arrest, which was their duty, or to at least inquire why they were hailed and then called to, to halt, they, as they had prepared for it and intended, proceeded to shoot and kill, and without any provocation whatsoever. They gave neither of these parties any time or opportunity to tell why they were hailing them. They wanted no reason. They already knew why, and, as stated, intended not to be arrested and to make no inquiry.

In our opinion the evidence clearly raised and fully established murder, which was submitted to the jury in a proper charge by the court. It may have raised the issue of manslaughter; if so, that was, in a proper charge, submitted to the jury, and the jury with ample evidence to justify it, found against them on that issue. The evidence may have raised the issue of self-defense, as stated, in connection with their attempted proper arrest; but if so, the court properly submitted that issue in their favor and the jury, with ample evidence to sustain it, found against them. The evidence did not raise and the court did not err in not submitting self-defense otherwise than as was submitted by the court. All of the evidence as to what appellants had done to the Bingham store, showing and tending to show that they burglarized, or attempted to burglarize it, was admissible and the court did not err in admitting it over appellant's objections thereto.

In our opinion the judgment should in all things be affirmed, and it is so ordered.

*Affirmed.*

DAVIDSON, JUDGE, dissents, and will file reasons.

DAVIDSON, JUDGE (dissenting).—I can not agree with the conclusion my associates have reached affirming the judgment. The State's case, in substance, is that Garvey, Brownlee and Henderson had been on an outing and returned at night to Texline. Garvey went to the hotel, while the others were scattered about looking after various matters. Shortly Brownlee came to the hotel and joined Garvey. While sitting on the hotel gallery and before Brownlee returned, Garvey saw two men come from behind screen doors, which were in front of the main door of the Bingham Hardware Store. There was a space between the screen or outer doors and the doors that led into the store. The screen doors were not fastened; the inner doors were locked. The doors to the store were not injured in any way, and were found closed and locked. The two parties emerging from behind the screen doors went across the street and disappeared. Brownlee came and Garvey

informed him of what he had seen. They armed themselves and took
a seat where they could be plainly seen, Brownlee accompanying Garvey
to this point. Some minutes later two men came from around the
corner and started, as Garvey states, in· the direction of the store from
where he had seen two men emerge. While these parties were in the
street Brownlee and Garvey spoke to them and asked what they were
doing there at that time of night. The parties made no reply but
started off in a brisk walk, when they were ordered to halt, Brownlee
raising his gun in a shooting attitude. Seeing this, the other parties
fired. The firing became general, Brownlee was shot and subsequently
died. Subsequent to all this the officers came upon the scene and
began an investigation of the store. It is uncontradicted that the store
had not been entered from the doors, and the doors were uninjured,
and that there was a space between the screen doors and the doors which
led into the house, forming a sort of vestibule. It is also shown there
was a window from which a pane of glass had been removed, which
pane of glass was found some feet away. Neither Brownlee nor Garvey
saw anybody open the window nor remove the pane of glass, nor is
there any positive evidence as to when the pane of glass was removed.
The testimony would seem to indicate, however, it had been removed
that night. This was all discovered after the shooting, and was un-
known to Garvey or Brownlee at the time of the shooting. This state-
ment is emphasized by what the judge says in the qualification to a
bill of exceptions. The court thus qualifies the bill: "The two men
then returned and angled to the other side of the street, and when they
had got in front of Timmons' store, and on the opposite side of the
street from where witness Garvey and the deceased were, the said de-
ceased, Brownlee, and witness got up and went out into the street, and
Brownlee said: 'What are you fellows doing around here at this time
of the night?' and that the two men then started off in a fast walk,
away from witness and Brownlee, and Brownlee halloaed to them to
'halt'; that the two men then started on a run, and Brownlee, deceased,
started to raise his gun as he called to them to halt. That Brownlee
called to them to halt twice, and as he started to raise his gun, one of
the two men fired a gun, then Brownlee fired back. About this time
one of the two other men fired. Brownlee fired two shots altogether;
and the two men fired about five shots. That witness Garvey fired one
shot in the air after Brownlee had fired two shots and the two men had
fired several shots." This is the qualification and statement of the
trial judge, which must be taken and accepted as correct, so far as this
record is concerned.

A bill of exceptions was reserved to the introduction of testimony
with reference to the removal of the pane of glass from the window,
the theory of the State being that this was an arrest on account of the
fact that an attempted burglary had been committed in the presence of
Garvey, who, though being a private citizen, would have the right under
the circumstances to make an arrest. This might be correct if Garvey
saw the attempt to commit the burglary. The removal of the pane of

glass from the window was not committed in his presence, view, hearing or sight; in fact, he knew nothing of it and had not heard of it until after the trouble was all over.  The objection to the introduction of this testimony should have been sustained.  The authorities are quite harmonious as well as numerous on this question.  If it had been committed within the view or sight of Garvey or Brownlee, the testimony might have been admissible.  Lynch v. State, 41 Texas Crim. Rep., 510; Cortez v. State, 44 Texas Crim. Rep., 169; Weaver v. State, 19 Texas Crim. App., 547; art. 259, C. C. P., 1911; Bill of Rights, sec. 19. In order to justify a private citizen or an officer to arrest under the circumstances of this case, without a warrant, for a felony or attempted felony, as the case may be, the acts must be done within his view, and, of course, this means with his knowledge.  He is not authorized to arrest without a warrant for a thing of which he had no knowledge nor committed in his presence, and, of course, if committed in his presence he would certainly know it.  This testimony was inadmissible and the court erred in permitting it to go to the jury.  The part of the explanation of the trial judge as herein quoted attached to the bill of exceptions demonstrates the fact that this was not committed in view of Garvey or Brownlee, who were attempting to halt the retreating or fleeing parties.  This is further demonstrated by the fact that the removal of the pane of glass from the window was not known to any witness in the case until after the trouble had ended and a subsequent investigation made.

There are a great many questions raised as to the rulings of the court, especially with reference to charges.  Without going into a detailed statement of these matters, it is more than questionable that arrest was an issue in the case.  Garvey and deceased, Brownlee, at no time stated to the defendants they were seeking to arrest them; they never informed them or attempted to inform them of that fact; they were strangers to each other, and the whole thing occurred at nighttime, Garvey and Brownlee being armed at the time they approached them.  The parties were all strangers to each other.  They could, had they desired, have informed them of the fact that they were undertaking to arrest them; they did not do so.  They did have time to ask them what they were doing on the street at that time of the night, and called twice to them to halt while they were running away.  If they had time to make these statements, certainly they would have had time to inform them that they were undertaking to arrest them.  Defendants did not prevent them doing so; in fact, they said nothing when challenged as to their purpose but moved away, and when ordered to halt, ran.  Certainly it is not resisting an arrest of any sort to run.  The court submitted to the jury that defendants could not justify in resisting an arrest if they prevented Garvey and Brownlee from informing them of the fact that they were undertaking to arrest them.  This theory of the judge is not supported by any fact.  The mere fact that a party flees when armed strangers approach him at night calling him to halt is not sufficient notice that the approaching parties are

undertaking to make an arrest. Garvey and Brownlee should have conveyed to appellants in some way the fact of an intended arrest if such was their purpose. If they had any purpose to arrest the defendants appellants were not aware of it. For authority on this question see Branch's Criminal Law, sections 437 to 444, inclusive, where the authorities are collated. This case was tried on the theory that appellants killed deceased resisting legal arrest. This was not a correct basis for the trial.

Appellants sought to have the issue of self-defense submitted as applicable to the facts. This was declined by the court, which is clearly error. The court, in a general way, charged the jury if appellants had committed a felony in the presence of or within the view of Garvey or Brownlee, and they should further find that Garvey and Brownlee were attempting to arrest the defendants, and as a matter of law, it was the duty of Brownlee and Garvey to inform appellants of the purpose for which the arrest was being made, provided they had time or opportunity to do so and was not prevented from doing so by appellants, and if the jury should find that they had such time or opportunity and failed to so inform the defendants of the purpose of such arrest, then their attempt at arrest would be illegal, and the defendants would have the right to resist and use such force as was necessary to prevent the illegal arrest, and if the jury should find from the evidence that it reasonably appeared to defendants that it was necessary to take the life of deceased to prevent the illegal arrest, then they would not be guilty. The trouble with this charge is, it is not predicated upon the facts. The charge is based upon a state of facts not shown by the record. There is nothing to justify the court in instructing the jury that appellants prevented Garvey and Brownlee from informing them of the fact that they were undertaking to arrest them. Brownlee was killed and did not testify. Garvey did testify but he nowhere, by any of the evidence, as I understand this record, testified that appellants prevented Garvey and Brownlee from notifying them they were trying to arrest them, and the court's qualification to the bill of exceptions, which shows the immediate facts and above quoted, demonstrates the fact that Brownlee and Garvey were not prevented from informing appellants of their purpose. They did not undertake to inform them; they merely challenged their business and presence on the street at that time of night, and when the parties ran called them twice to halt. Failing to halt, one of the parties raised his gun to shoot and appellants fired. The firing became general. Certainly the court having given this charge, if even authorized by the facts, the converse of the proposition should have been also given. In other words, the entire charge practically ignores the question of illegal arrest and the rights of appellants under such a state of facts. To the mind of the writer this is so clearly an attempted illegal arrest even if arrest was in the case it is not questionable, and this by all the authorities that have been called to my attention. Again, the court should have charged the jury fully with reference to the law of self-

defense from the viewpoint of an illegal or attempted illegal arrest. If there is a case holding otherwise, I have failed to find it in the decisions of this State. See Branch's Criminal Law, specially secs. 437 and 439; Montgomery v. State, 43 Texas Crim. Rep., 304; Cortez v. State, 43 Texas Crim. Rep., 375; Mooney v. State, 65 S. W. Rep., 926; Hardin v. State, 40 Texas Crim. Rep., 208; Owen v. State, 58 Texas Crim. Rep., 261. Appellants had the legal right to have their view of the case submitted to the jury, which the court failed to do in his general charge, and refused all charges looking towards presenting their side of the case. Appellants also had the right to have the law of perfect self-defense presented. They also had the legal right to have self-defense presented from the standpoint of an illegal or attempted illegal arrest. But so far as the facts are concerned, there is nothing to indicate that appellants knew the purpose or intent of Garvey and Brownlee. They were both armed, seeking to stop or halt· them on the street and inquiring their business in the night-time, all being perfect strangers. There was no communication or attempted communication on the part of Garvey or Brownlee that they were undertaking to arrest them, but they did act in a manner that indicated to appellants that they intended to shoot.

From any viewpoint this case ought not to be affirmed, and I, therefore, respectfully enter my dissent.

ON REHEARING.

April 7, 1915.

PRENDERGAST, PRESIDING JUDGE.—Appellants, in their motion for rehearing, present and again urge some of the same points they originally contended for,—decided in the original opinion against them.

Since the original opinion was handed down Judge Davidson filed a dissenting opinion. We first desire to call attention to some of the mistakes by Judge Davidson as to what the evidence was. After stating that Garvey, Brownlee and Henderson had been out on an outing and returned at night, he says: "Garvey went to the hotel, while the others were scattered about looking after various matters. Shortly Brownlee came to the hotel and joined Garvey. While sitting on the hotel gallery and before Brownlee returned, Garvey saw two men come from behind screen doors, which were in front of the main door of the Bingham Hardware Store. . . . The two parties emerging from behind the screen doors went across the street and disappeared. Brownlee came and Garvey informed him of what he had seen." In the original opinion we correctly and accurately stated these matters. It was Brownlee, deceased, and not Garvey who at first went to the hotel, while Henderson and Garvey went to put up the team. It was Garvey who later came to the hotel and joined Brownlee, and not Brownlee who there joined Garvey. It was Garvey, while he was returning to the hotel from putting up the team, and as he approached the front of

said store, who saw the appellants suddenly emerge from behind said screen doors, where they were secreted, and rapidly depart therefrom. Neither Brownlee nor Garvey, while at the hotel, saw appellants emerge from the screen doors. This occurred, as stated, while Garvey was returning from putting up the team and he at once went to the hotel and reported these facts to Brownlee. Neither of them, from the hotel, saw the parties emerge from said screen doors.

Mrs. Brownlee, the widow of deceased, testified: "On the night of August 19, 1914, being the night my husband was killed, my husband, John Garvey and G. G. Henderson returned from a fishing trip, having gone on the trip during the day. I did not see the other two men when they came home that night, but my husband came upstairs where myself and our little baby were, woke up the baby, and went downstairs to see about some ducks they had killed. At this time my brother, John Garvey, accompanied, I think, by Mr. Henderson, had gone to put up the horse. When John returned he told my husband that somebody was trying to get into Bingham's Hardware Store." (S. F., p. 2.)

John Garvey testified: He first told about himself, said Henderson and Brownlee, deceased, having been out hunting that day and returned the night of the killing about 11:30. Then said: "We made the trip in a livery rig, and on our return, in front of my father's hotel, Brownlee got out, Mr. Henderson and myself went to the livery stable about three blocks away to return the rig. After we put up the livery rig, we went to the depot, stayed there thirty or forty minutes, and Mr. F. D. Mize, the night operator, Mr. Henderson and myself all started home, going together as far as the railroad track, where Henderson separated from us. Mize and myself went down Taylor Street and Mize left me at lot 15 in the first block, and I went around the corner to Bud Caddell's store, on lot 11. Doc Bingham's store is on lots 9 and 10, and father's hotel is on lot 7. Lot 8 is vacant, but is fenced. As I came around the corner to Bingham's porch, I saw two men emerge from the screen door, which opens on the porch, and heard the door slam. There is a space between the screen door and the door which opens into the building. I was on the north end of Doc Bingham's porch when the men came out of the screen door; they were at a fast pace, as if they were scared. They went to the end of Bingham's porch, turned into the middle of the street to the water tank, where I lost sight of them. I then went and told Brownlee, who was in the hotel, and he said, 'We will go out and see if we can see them.'" (S. F., pp. 3-4.)

This testimony by Mrs. Brownlee and John Garvey was not contradicted by any other witness and there was no testimony by any witness, or circumstance proven, which would contradict it or tend to do so.

Judge Davidson's mistake as to this evidence would not be specially material. We merely call attention to it in order "to keep the record straight," and as tending to show that he is likewise mistaken in his opinion as to the legal questions in the case and the citation of authorities to sustain them.

In the original opinion we did not give all of the testimony which showed that appellants had actually burglarized said Bingham's store. We did give, in substance, considerable of the testimony on that point. We then deemed it unnecessary to state all. However, we will now give in substance the other of that testimony.

C. S. Bingham, the owner of said store, and his only clerk, Ernest Martin, each, in substance, testified that Bingham had certain decorated plates in said window right inside of where appellants removed said large pane of glass; that this window was intact when Bingham left town in the evening of the night of the killing and was also intact when Martin closed the store and left it for the night. The other testimony, without dispute, conclusively shows that appellants, and no other, removed said pane of glass just about midnight or between that time and when Garvey "flushed" them and ran them out of their hiding place behind said screen doors some ten minutes before the actual killing. Charley Gibbons testified that the next morning after the killing that night, he found a decorated plate at the corner of an alley about a block from Bingham's store. The statement of facts shows that he further designated where this was. The court and jury below had the city map and other data before them which is not contained in this record. Taking it all, we conclude that this plate was found in the location where appellants went immediately after they were run out of their hiding place behind said screen doors by Garvey, and the other facts would clearly justify the jury to conclude, as we do from the statement of facts, that they took that plate out of that window, carried it with them when they were run away from the building by Garvey, and left it where Gibbons said he found it the next morning, and then that appellants returned in front of said building in an attempt to further burglarize it as shown in the original opinion. Bingham and Martin sufficiently identified this plate as one that belonged to Bingham and must have been taken out of said window by appellants, as shown above, thus establishing a complete burglary of said building by appellants within a very brief space of time before the killing.

In the original opinion, we did not fully give appellants' only bill of exceptions to the introduction of testimony, deeming it unnecessary at the time. We will now state this more fully. There is but one bill on the subject. It shows that appellant objected to the testimony of said Henderson, showing that shortly after the shooting, perhaps within an hour, he, with others, went to examine Bingham's store, and that they then found that this window had been taken out as shown in the original opinion. That he also then found tracks in front of said store on the sidewalk; that he examined them and compared them with the shoes which were removed from the defendants on the next day and that the size and dimensions of the tracks compared with that of their shoes; that he also assisted in the arrest of appellants and there was found in the pocket of the defendant Stewart a piece of iron which he and others afterwards fitted into the places where it had been used to

remove said window pane and that it not only fitted therein precisely, but that the putty and paint thereon was shown to have come from said window frame and fitted it precisely. This bill also shows he objected to the testimony of said Bingham to the fitting into the impression of the wood at the window said piece of iron where appellants had used it to remove said pane of glass from the window and the whole of his testimony on that subject; and to the further testimony of said Bingham about the measurements of the shoes of appellants the next day with the tracks in front of his store, and that they corresponded. Said bill further shows that he objected to the testimony of Mr. J. E. McCandless, wherein he testified that he, together with Mr. Henderson, assisted in the arrest of appellants the next morning and that they found in the pocket of Stewart said piece of iron; that he turned it over to Bingham and that he also examined the window frame in said store and found that the impressions made by said piece of iron fitted exactly the impressions in said window made thereby; that he removed appellants' shoes from their feet on the next evening after the shooting the night before, turned them over to Mr. Bingham and identified them on the trial of this case as being the shoes of appellants worn at the time. Said bill also objects to the testimony of said Gibbons about finding the plate mentioned above, and to the testimony of Martin along the same line. In fact, this bill is to the testimony of said witnesses which showed and identified appellants as the persons who removed said window pane and committed the said burglary immediately before the killing of deceased.

We think there can be no question but that this evidence was clearly admissible under the circumstances of this case.

In Jacobs v. State, 28 Texas Crim. App., 79, it was shown that Deputy Sheriffs Bickett and Pool of Milam County with a posse whom they had summoned, went to the house of Bounds to arrest Jacobs for unlawfully carrying a pistol. They had no warrant. They reached Bounds' house at night; that in their attempt to arrest him while in the house Jacobs shot and killed Deputy Sheriff Pool. He was prosecuted and convicted for murder in the second degree and his conviction affirmed. On the trial the State introduced the record from the District Court of Frio County which showed that Jacobs, at the time he killed Pool, was charged by indictment, in said Frio County, with murder. The appellant objected to this evidence. The court, through Judge Willson, held that it was competent evidence, saying: "It established a circumstance which tended to show defendant's motive in committing the homicide; which tended to show that he was a fugitive from justice, who had resolved to evade and resist arrest for a capital crime at any and all hazards regardless of consequences, and regardless of whether his arrest should be attempted legally or illegally. It furthermore tended to explain the conduct and motives of the officers and posse that were seeking to arrest the defendant, and to throw light upon the whole transaction. It was in fact a part of the res gestae of the homicide."

In Cortez v. State, 43 Texas Crim. Rep., 375, appellant therein was indicted and convicted for the murder of Henry Schnabel in Gonzales County. It was shown that at the time of the killing Schnabel and others were attempting to arrest him without warrant. The State was permitted to prove by Choate, over Cortez's objections, that two days before the killing of Schnabel for which he was on trial, he, Choate, went with Morris, sheriff of Karnes County, to where defendant and his brother were in Karnes County, to arrest defendant for horse theft; that an altercation occurred and defendant shot and killed Morris, after Morris had shot and badly wounded defendant's brother. The court, in that case, in an opinion by Judge Henderson held that said testimony was admissible, saying: "Under the doctrine laid down in Jacobs v. State, 28 Texas Crim. App., 79, said testimony was admissible. That was a case in some respects similar to the one at bar; and it was there said, 'That the former killing established a circumstance which tended to show defendant's motive in committing the homicide. It tended to show that he was a fugitive from justice; he had resolved to fight and resist arrest for a capital crime at any and all hazards, regardless of consequences, and regardless of whether his arrest should be attempted legally or illegally. It furthermore tended to explain the conduct and motives of the officers and posse that were seeking to arrest defendant, and to throw light upon the whole transaction. It was in fact a part of the res gestae of the homicide.' Of course, the fact that appellant may have killed the sheriff of Karnes County, and fled from arrest, did not authorize an illegal arrest. But conceded, that the arrest was illegal, the testimony would tend to indicate the purpose and intent of appellant in what he did. . . . His action in resisting an illegal arrest might show such a wanton killing as to indicate murder. . . ."

In Cortez v. State, 44 Texas Crim. Rep., 169, it is shown that Cortez was therein convicted for the murder of said Morris, the sheriff of Karnes County. In that case it was sought to be proved by several witnesses that at the time appellant killed said Morris, Morris and others were attempting to arrest him for horse theft, but it was shown that he was not guilty of horse theft, and in no way connected with any other who was guilty of horse theft, Judge Henderson stating: "No person is shown to have had any stolen horse, much less that appellant was the guilty party." The court held that that testimony, under that state of facts, was inadmissible, but again expressly recognized, as correct, the rule announced in Jacobs v. State, supra, and Cortez v. State, 43 Texas Crim. Rep., 375, saying: "This is not like the case of Jacobs v. State, 28 Texas Crim. App., 79, or Cortez v. State, 43 Texas Crim. Rep., 375, which followed the former case. In both of said cases appellants were shown to be fugitives from justice at the time of their attempted arrest; they were thereby charged with notice of the object of the officers in pursuing them. Not so here, as there was absolutely no testimony showing or tending to show that

appellant was at the time a fugitive from justice or was then endeavoring to escape."

Again, in Cortez v. State, 47 Texas Crim. Rep., 10, it is shown that Cortez was indicted and convicted for the murder of R. M. Glover, sheriff of Gonzales County, with life imprisonment as a penalty. The case was affirmed. In that case also, the State was permitted to prove over appellant's objections, by Choate, the facts and circumstances attending the killing of Morris, sheriff of Karnes County, in Karnes County, two days before the killing of said Glover. This court therein, through Judge Brooks, again held said testimony admissible, saying: "We hold that said testimony was admissible to show motive and as suggested in Cortez v. State, 43 Texas Crim. Rep., 375, to explain the conduct and motive of the officers and posse seeking to arrest defendant, and throw light upon the whole transaction. It was in fact a part of the res gestae of the homicide and would tend to indicate the intent and purpose of the defendant in what he did." In that case it was shown that Sheriff Glover and others, at the time he was killed by Cortez, intended to arrest him without warrant for the killing of said Sheriff Morris, two days before. See also Smith v. State, 48 Texas Crim. Rep., 233; Fifer v. State, 64 Texas Crim. Rep., 203.

We have thus shown that the Cortez case, 44 Texas Crim. Rep., 169, held the reverse of what it was cited for by Judge Davidson. The Lynch case, 41 Texas Crim. Rep., 510, and Weaver case, 19 Texas Crim. App., 547, are not in point on this question and certainly section 19 of the Bill of Rights is not.

The court, in his main charge, told the jury: "18. The law required that in making an arrest of an accused by any person other than an officer, such person making such arrest shall inform the accused of the purpose for which said arrest was made, and it is made his duty to do so, if he has time or opportunity, and whether or not the person making such arrest has such time or opportunity is a question of fact, to be determined by the jury from all the facts and circumstances in evidence.

"19. If you believe from the evidence that at the time of, or immediately prior to the shooting of R. C. Brownlee, the defendants had committed a felony, as above defined (that is, burglary or attempted burglary), and the same, if any, had been committed in the presence of or within the view of John Garvey or R. C. Brownlee, and if you further find that the said John Garvey and R. C. Brownlee were attempting to arrest the defendants, you are charged as a matter of law, that it was the duty of the said John Garvey and R. C. Brownlee to inform the defendants of the purpose for which said arrest was being made, provided they had the time or opportunity so to do, and if you find that they had such time or opportunity and that they failed so to inform the defendants of the purpose of such arrest, then their attempting to so arrest the defendants would be illegal, and the defendants would have the right to resist such illegal arrest and to use such force

as was necessary to prevent such illegal arrest, and if you believe from the evidence that it reasonably appeared to the defendants, viewed from the standpoint of the defendants at the time, that it was necessary to take the life of deceased to prevent such illegal arrest, you will find the defendants not guilty."

We stated the facts in the original opinion applicable to this question and, as stated therein, the facts were not controverted. This charge of the court was peculiarly applicable to the facts of this case and was all that was required on the subject. There can be no doubt from the evidence that the appellants, within a very short period of time before they killed Brownlee had actually burglarized Bingham's store and they were practically caught in the act by Garvey, who ran them away from said house, and he, within their view, went directly from where he had run them from to the Garvey Hotel, where Brownlee was. The light from the hotel showed appellants that he went there. The uncontroverted testimony is that he immediately communicated the facts to Brownlee, and together they then went down in front of the hotel, in full view of appellants when they returned in their further attempt to burglarize said store, and when appellants first saw them they immediately desisted from their further attempt to burglarize said store. Both Brownlee and Garvey actually saw them in this last attempt. Appellants knew that they had just burglarized said store and they returned to it in further attempt to burglarize it. When they discovered Brownlee and Garvey watching them they knew they were seen in their attempt. They immediately and hastily undertook to depart. Brownlee and Garvey went out in the street in front of said hotel with the light therefrom shining upon them, showing their persons fully to appellants. Neither Brownlee nor Garvey attempted to conceal themselves, but, on the contrary, put themselves in full view of appellants. Their hailing them to know what they were doing there that time of night was a clear indication to appellants that they had been seen in their attempt to burglarize said store, and from the facts they could draw no other inference than that Brownlee and Garvey were then attempting to arrest them for the burglary and the attempted burglary of which they knew they were guilty. The inquiry of them by Brownlee at the time, under the circumstances, as distinctly told them that they were attempting to arrest them for said crime, whether they were officers or not and whether they had process or not, and the whole of acts of Garvey and Brownlee and what they said to them was as sufficient and complete information to appellants of the purpose of Brownlee and Garvey as if they had in specific language told them at the time: "You have burglarized Bingham's store and you have just attempted to burglarize that store. We saw you and you know it. We hail you now for the purpose of arresting you and for no other purpose." Hence, the information given by Brownlee and Garvey to appellants at the time under the circumstances was ample and full, and the jury were clearly justified in not acquitting the ap-

pellants under their claimed self-defense for an illegal arrest even if it could be held to be an attempt to illegally arrest.

"If a party about to be arrested knows the capacity and purpose of the officer it is not necessary for the officer to make known said purpose or in what capacity he is acting. Plaster v. State, 1 Texas Crim. App., 673." Montgomery v. State, 43 Texas Crim. Rep., 304; Smith v. State, supra.

It has frequently been held by this court that an illegal or attempted illegal arrest, and an unlawful restraint of liberty under an illegal arrest, stand upon the same legal plane.

In Miller v. State, 31 Texas Crim. Rep., 609, p. 639, Miller, in attempting to secure his liberty from an illegal arrest, killed an officer. He was convicted of murder in the first degree with the death penalty inflicted. This court affirmed that judgment. In that case this court said:

"The question at last is, what cause, reason, or motive actuated the defendant in committing the homicide? It is the settled law of this State, that in arriving at a correct conclusion in homicide cases, the killing should be viewed from the defendant's standpoint; that is, to ascertain as nearly as possible, from the evidence, the reasons and motives which moved or induced the accused to do the killing. It has been held, that an unlawful arrest is esteemed, in law, a great provocation. If it be conceded that such provocation constitutes 'adequate cause,' under our statute, then, in order to reduce the killing to manslaughter, 'sudden passion' must have existed in the mind of the slayer at the time of the homicide; otherwise, the killing would be murder. Massie v. State, 30 Texas Crim. App., 64; Ex parte Jones, ante, p. 422; Ex parte Sherwood, 29 Texas Crim. App., 334; Miller v. State, 32 Texas Crim. Rep., 319. Such provocation, in the absence of 'sudden passion,' may become evidence of a most cogent character and force, showing malice. (Same authorities.) Again, if there exists a provocation unknown to the accused at the time of the homicide, this would not suffice to reduce the killing below murder. There must be a concurrence of 'adequate cause' and 'sudden passion,' as defined by our statute, to reduce a felonious homicide to the degree of manslaughter.

"As was said by Judge Hurt in Dyson's case, 14 Texas Court of Appeals, 454: 'When the prisoners have been some time in custody, and the informality of the warrant under which they were held was unknown to them, and they deliberately planned and carried out an attack which resulted in the death of one of the officers, this was held murder, and not manslaughter.' And again, in Sherwood's case: 'Because without such knowledge the provocation could have no effect upon him whatever, and hence without such knowledge it is absolutely certain that his passions, if any, were not caused by this provocation.' 29 Texas Ct. App., 334. This court has further held, that where a party, 'expecting an attempt will be made to arrest him illegally, deliberately prepares arms for immediate use, and calmly and deliberately determines to kill the person attempting the illegal arrest, and upon his

appearance for that purpose does kill him, such killing would be upon express malice; and to hold the slayer guilty upon express malice would not only be law, but common sense and justice.' Miller v. State, 32 Texas Crim. Rep., 319."

We think what is said, which we quoted in the original opinion from Miller v. State, 32 Texas Crim. Rep., 319, and which is cited and from which a quotation is made in Miller v. State, 31 Texas Crim. Rep., 639, supra, is peculiarly and specially applicable to this case. And, as shown, appellants, in the dead hours of the night, just after 12 o'clock, burglarized Bingham's store. They were practically detected in the act by Garvey, and when so detected they immediately and hastily departed therefrom. Garvey went immediately to the hotel and communicated the fact to Brownlee, and they, together, in a perfectly proper way, put themselves in position where they could see appellants if they returned to said building and attempted to further burglarize it. While thus watching, within plain view and close to said building, they saw appellants return to it and further attempt to burglarize, and when appellants discovered that they were thus actually seen in their attempted burglary, they sought to escape and were immediately hailed by Brownlee and Garvey, who were in full view, and in a proper way, sought to arrest them. Appellants actually knew this. They also knew, not only that they had just before then actually burglarized this house and were run away therefrom, but that they were actually seen by Brownlee and Garvey when they returned about eight minutes later in the further attempt to burglarize it. The evidence, without contradiction, shows also that they had unlawfully armed themselves each with a pistol, doubtless with the intention to kill anyone who should attempt to arrest them, and when Brownlee and Garvey attempted to arrest them they carried out their deliberately and coolly planned scheme to murder, and did murder Brownlee. Appellants could not have supposed, under the circumstances, which were all within their knowledge, that Brownlee and Garvey were attempting or intending to do anything else but to arrest them for the crimes that they had immediately committed in their view and that Brownlee and Garvey could have had no other purpose or intention.

After a careful re-examination of the record in this case and the law applicable to the facts, which were uncontradicted, we think that the court in the charge properly submitted every question that the evidence raised, and that the court did not fail to submit properly every question that was raised; that there was no error in the trial of this case that would authorize or legally permit this court to reverse the judgment and that the evidence, without doubt, established the guilt of the appellants as found by the jury. The motion for rehearing is overruled.

*Overruled.*

DAVIDSON, JUDGE.—The opinion of Presiding Judge Prendergast discusses at some length the fact that in my dissent I stated that Garvey was on the hotel gallery when the appellants came from behind the

screen doors of the house mentioned in Garvey's evidence when, as a fact, it was Brownlee who was on the gallery. Garvey and Brownlee were the two parties engaged in the difficulty with appellants. Had I noticed this discrepancy, or if my attention had been called to it, the necessary correction would have been made. But I was not aware until the rehearing opinion was handed down that the mistake in the names had occurred. Whether Brownlee or Garvey was the party who sat on the gallery is a matter of no moment as will be observed from an inspection of the opinions in the case. I do not care to notice other matters further than I have written.

